**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOYCE A. TAYLOR HAYNIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22CV672 JAR |
| | ) | |
| WASHINGTON UNIVERSITY SCHOOL | ) | |
| OF MEDICINE DIVISION OF | ) | |
| INFECTIOUS DISEASES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment [ECF No. 41]. Plaintiff filed her response in opposition. For the reasons set forth below, the Motion will be granted.

**Background**

On June 24, 2022, Plaintiff Joyce A. Taylor Haynie filed her pro se Complaint against Defendant Washington University[1] for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.,* and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. §§ 213.010, *et seq.,* for Race Discrimination and Retaliation. Plaintiff alleges that Defendant discriminated against her because of her race and retaliated against Plaintiff after complaining of such discrimination by, *inter alia*, eliminating her position. On October 19, 2022, an attorney entered on behalf on Plaintiff. On January 30, 2023, Plaintiff filed her Second Amended Complaint.

---

[1] Defendant clarified in its Motion that Washington University School of Medicine and its Division of Infectious Diseases are not independent legal entities from Washington University.

On May 26, 2023, Defendant filed the instant motion, claiming it is entitled to summary judgment on Plaintiff's Second Amended Complaint in its entirety. Defendant attached a Statement of Uncontroverted Material Facts in Support of its Motion, which Plaintiff responded to and noted her oppositions. Plaintiff filed her response in opposition to Defendant's Motion. Defendant filed a reply, and Plaintiff filed a sur-reply with leave of this Court. The parties each attached exhibits, including emails and portions of deposition testimony, with their respective memoranda.

**Facts**

In Defendant's reply, it raises issues about Plaintiff's response to its Statement of Uncontroverted Material Facts, arguing she does not comply with this District's Local Rule 4.01(E) that states in pertinent part:

> Every memorandum in opposition must be accompanied by a document titled Response to Statement of Material Facts, which must be separately filed using the filing event "Response to Statement of Material Facts." The Response must set forth each relevant fact as to which the party contends a genuine issue exists. The facts in dispute shall be set forth with specific citation(s) to the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from the moving party's Statement of Uncontroverted Material Facts. All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

Local Rule 4.01(E).

Despite Defendant's contention, the Court finds Plaintiff properly titled and formatted her response. However, the Court does agree with Defendant that a majority of the facts that Plaintiff disputes are either self-serving, conclusory statements from her own deposition testimony or are unsupported by the evidence.  Where Plaintiff establishes that a justifiable inference may be drawn in her favor, the Court accepts Plaintiff's version of events as true. However, self-serving,

2

conclusory statements without support are insufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993). "The Court therefore does not consider statements...which merely constitute personal opinions as opposed to facts." *Woods v. Wills*, 400 F. Supp. 2d 1145, 1162 n. 7 (E.D. Mo. 2005); *See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (holding that in response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'").

The following facts are taken from Defendant's Statement of Uncontroverted Material Facts [ECF No. 43] and are undisputed, unless otherwise noted with a citation to the record:

The University hired Plaintiff, who is an African American female, in August 2017 as a Research Nurse Coordinator I in the Clinical Research Unit of Defendant's Division of Infectious Diseases ("ID-CRU"). Plaintiff's offer letter for this position stated: "Because your salary is funded by a grant, your employment will be contingent upon the continued receipt of these grant funds."

In May 2018, Plaintiff was involved in a "verbal altercation with coworker, A.J. Winingham…" during which she raised her voice and her "hand to indicate [she] would no longer engage in the exchange…" Defendant's Exhibit (Ex.) P, Plaintiff's Employment Discrimination Complaint [ECF No. 43-16 at 5-6]; Defendant's Ex. A, Plaintiff's Deposition [ECF No. 43-1 at 99:21–100:3, 103:8–11].

In June 2018, Plaintiff received her first annual performance evaluation with the ID-CRU. Plaintiff's June 2018 performance evaluation rated her overall performance 2 out of 4 and noted that Plaintiff had "some difficulty in interactions with co-workers." Plaintiff only

3

recalls having the issue with Winingham in May 2018 as described above. Defendant's Ex. A, Plaintiff's Deposition [ECF No. 43-1 at 99:5–100:3, 103:8–11].

By November 2018, five patients in studies conducted by the ID-CRU had complained about Plaintiff's venipuncture skills and specifically requested that she no longer be permitted to take their blood.

Around December 2018, Constance Cafazza, the ID-CRU Quality Assurance Manager, complained to Plaintiff's supervisor, Lisa Kessels, that Plaintiff was not submitting her case report forms (CRFs) in a timely manner and that Plaintiff was making errors in her CRFs. For instance, Plaintiff stated in the "comments" section of one CRF that the patient had discontinued the study drug. Defendant's Ex. Z, Declaration of Lisa Kessels [ECF No. 43-26 at 5-6]. However, in that same CRF, Plaintiff included the study drug in the patient's list of current medications. *Id.* In another instance, Plaintiff stated in another CRF that the patient was not examined, but also stated that the patient had no changes since the baseline visit and that the patient complained of a "persistent nagging cough," which was not noted in the CRF from the patient's baseline visit. *Id.* at 9-10. Kessels kept the documents showing these discrepancies in Plaintiff's employment file. *Id.* at 2. Plaintiff tried to confront Cafazza to address her issues regarding Plaintiff's CRFs. Defendant's Ex. A, Plaintiff's Deposition [ECF No. 43-1 at 145:2–4]. Plaintiff later heard that her co-worker Cafazza cried as a result of the confrontation.  Plaintiff then was required to have all of her CRFs reviewed by Kessels before submitting them to Cafazza.

In January 2019, Kessels offered Plaintiff and another African American female, Dr. Kimberly Gray, the opportunity to move from their cubicles to Office 265 ("the office") together

4

while the workspace was being renovated. *Id.* at 146:21–23, 149:23–150:13. Plaintiff and Gray

then suggested that a third employee, Tina Robinson, who is also an African American female,

relocated to the office with them. *Id*. at 151:11–19. Robinson was also being relocated during the

renovations and had previously talked to Kessels that she preferred not to be in the cubicle area.

*Id.* at 151:19–24. The office used to be shared by Cafazza and the two ID-CRU principal

investigators, Dr. Andrej Spec and Dr. Rachel Presti, who are all white. *Id.* at 146:21–147:11.

Dr. Spec and Dr. Presti used the office for temporary periods of time while in the ID-CRU and

had another office elsewhere. *Id.* at 147:11–25. Robinson testified in her deposition that the

office was commonly referred to the" closet" because of its small space and no windows.

Plaintiff's Ex. 3, Robinson's Deposition [ECF No. 48-3 at 43:6–23].

After the three employees relocated to the office, Plaintiff complained to Kessels about

the space. Defendant's Ex. A, Plaintiff's Deposition [ECF No. 43-1 at 153:2–11]. Kessels

offered Plaintiff the opportunity to move back to her cubicle, but Plaintiff declined the offer. *Id.*

Plaintiff also complained to JoAnne Estwanick[2] about the lighting and limited space in the

office. *Id.* at 153:15–25.

In May 2019, Plaintiff raised concerns about race discrimination to Human Resources

(HR) Consultant Heidi White about having three African American employees share the same

office. *Id.* at 147:11–25. Gray and Robinson had also raised concerns to Dr. Mike Klebert, a

member of the ID-CRU leadership, about the optics of having three African American women

share the same office. Plaintiff's Ex. 3, Tina Robinson's Deposition [ECF No. 45-3 at 48:11–

49:50].

---

[2] Joanne Estwanick's last name is now Couch.

In June 2019, Plaintiff received her second annual performance evaluation with the ID-CRU. Plaintiff's June 2019 performance evaluation rated her overall performance 1.9 out of 4 and noted "multiple instances where [Plaintiff] turned in incomplete CRFs," that Plaintiff "occasionally does not meet deadlines for CRF submission," and that Plaintiff "should work to resolve conflict in a positive and professional manner." Plaintiff did not believe this was a fair evaluation and communicated this to Estwanick, who is Kessels's supervisor. Defendant's Ex. A, Plaintiff's Deposition [ECF No. 43-1 at 170:22–25, 185:25–186:4, 190:5–9].

Ultimately, Plaintiff's overall rating in her 2019 performance evaluation was adjusted from 1.9 to 2, but the comments noting "multiple instances where [Plaintiff] turned in incomplete CRFs," that Plaintiff "occasionally does not meet deadlines for CRF submission," and that Plaintiff "should work to resolve conflict in a positive and professional manner" remained in the evaluation. Kessels offered to bring in a mediator to help Plaintiff resolve her ongoing interpersonal conflicts, but Plaintiff declined.

On July 26, 2019, White issued a letter informing Plaintiff that she did not find corroborating evidence of discrimination based on race after investigating her complaint. Defendant's Ex. 3, Heidi White's Deposition [ECF No. 43-14 at 34:5–19]. White's letter said that leadership expressed that they did not intend for this to provide a negative perception, and with upcoming space adjustments, they will take the complaint into consideration. *Id.* at 34:20–25. White also testified in her deposition that her investigation revealed that the office move took place because the workspace was being renovated, so Plaintiff and Gray were offered the option to share the office together or each have a cubicle during that time. *Id.* at 28:5–21.

In August 2019, Plaintiff and Dr. Gray were offered to move into a different office space.

6

Defendant's Ex. A, Plaintiff's Deposition [ECF No. 43-1 at 166:13–22, 168:6–11]. Dr. Gray decided to stay in the office with Robinson and Plaintiff moved into a different office. *Id*. at 165:16–18, 165:12–23. Both Gray and Robinson are still currently employed with the ID-CRU. Defendant's Ex. Z, Kessels's Declaration [ECF No. 43-26 at 1-2].

In September 2019, Plaintiff asked Teresa Spitz, one of her ID-CRU co-workers, if she could speak with her, and they went into Spitz's office. Plaintiff closed the door and sat down approximately two feet away from Spitz. Plaintiff began explaining to Spitz that she was upset with her about taking Plaintiff's charts and not letting her know.

After approximately 15 to 20 minutes, another ID-CRU employee knocked on Spitz's office door and told Plaintiff and Spitz that there was a mandatory meeting taking place. Plaintiff and Spitz proceeded to the meeting. Kessels testified in her deposition that Spitz was crying as she walked into the meeting. Defendant's Ex. E, Kessels Deposition [ECF No. 43-5 at 71:13–14]. After the meeting, Spitz told Kessels that she was no longer willing to work with Plaintiff.

Spitz prepared a written report of the incident with Plaintiff where she described Plaintiff's behavior during the confrontation as "very agitated," explaining that Plaintiff's "voice was raised" and that Plaintiff had "continued to lean forward in her chair" until Spitz "couldn't move back any further because [her] chair was backed up to [her] desk." In the same report, Spitz further described feeling intimidated by Plaintiff's actions, stating that she felt "very uncomfortable when [Plaintiff] is around," and that she would "prefer to no[t] be alone with [Plaintiff]." Plaintiff does not dispute that this is what Spitz's report said, but disputes the nature and tone of the interaction.

Estwanick received a copy of Spitz's written report. Following the incident between Spitz

and Plaintiff, Dr. Spec sent an email to White describing the incident as "a significant altercation" and explaining that "there [are] very few people in the unit who are still comfortable with [Plaintiff]." Dr. Spec's email also stated that he was "growing more and more concerned about [Plaintiff's] aggressiveness" and that despite "multiple discussions with [Plaintiff] about ways to improve her work, . . . we have been met with a stone wall" and "things cannot continue like this." Dr. Presti, who was copied on Dr. Spec's email to White, replied that she was "concerned" that the incident with Spitz "reflects a pattern of behavior which is intimidating to staff" and "is not tenable moving forward" and listed four other "concerning episodes" involving Plaintiff. Dr. Presti concluded her email by stating, "We now have a situation where [Plaintiff] is not only underperforming, but she has made staff feel threatened and uncomfortable to a point where several have suggested they might look for other positions." Estwanick was copied on Dr. Spec and Dr. Presti's emails to White.

In January 2020, Kessels, Estwanick, Dr. Presti, and Dr. Spec, in consultation with White, made the decision to put Plaintiff on a performance improvement plan (PIP). Dr. Spec testified in his deposition that they put her on a PIP because her job performance had not improved, and if anything, she "had gotten worse at her job in the three years" that she had been working in the ID-CRU. Defendant's Ex. U, Dr. Spec's Deposition [ECF No. 46-23 at 76:7–15].

On January 21, 2020, Plaintiff met with Kessels, Estwanick, and Dr. Spec where they presented her with the PIP, which listed the following five "areas of concern:" (1) "Interactions with other staff members and leadership;" (2) "Completing tasks in a timely manner;" (3) "Not utilizing effective communication with co-workers;" (4) "Not attending required meetings or arriving late;" and (5) "Lack of improvement after previous discussions." The PIP also listed

five improvement goals/behaviors and tasks/expectations.

On January 30, 2020, Plaintiff was unexpectedly hospitalized and went on a medical leave of absence. When Plaintiff returned from her leave of absence on March 13, 2020, she met with Kessels and Estwanick to discuss resuming the PIP. Because the COVID-19 pandemic had just begun in March 2020, Plaintiff was working remotely and her only job duty when she returned from leave was to complete chart abstractions. Therefore, the PIP that went into effect upon Plaintiff's return to work in March set the expectation that Plaintiff complete one chart abstraction per day.

Chart abstraction is a manual data entry process in which certain information from an individual's medical record is transcribed into an electronic health record. On March 27, 2020, Kessels, Estwanick, and Dr. Spec met with Plaintiff over Zoom to discuss her progress on the PIP. During the March 27, 2020 meeting, Plaintiff reported that she had completed only five chart abstractions since she returned to work on March 13, which was less than the expectation of one per day; however, Plaintiff assured the group that she could complete five more abstractions in the next five days.

On March 30, 2020, Plaintiff contacted White to make a complaint based on the implementation of the PIP. After looking through the details provided with the performance concern and the process leadership took in placing Plaintiff on the PIP, White found that there was no evidence of retaliation. *Id.* at 40:4–16. White issued another letter to Plaintiff indicating her findings regarding the lack of retaliation. *Id.* at 40:12–16. Plaintiff disputes that this complaint was for retaliation and asserts it was for race discrimination.

On April 10, 2020, Kessels, Estwanick, and Dr. Spec again met with Plaintiff to discuss

9

her progress on the PIP. During this meeting, Plaintiff was informed that she had not met the expectations of the PIP, both because she had not completed her assigned chart abstractions in the timeframe outlined in the plan and because the charts she did complete were not acceptable quality and would have to be redone by other staff members. Plaintiff was also informed that she was being placed on furlough for two weeks due to the pandemic. At the end of the two-week furlough period, Plaintiff was informed that her furlough would be extended through July 27, 2020 as the University worked to navigate substantial revenue losses caused by the pandemic. Kessels testified in her deposition that by April 2020, Defendant's School of Medicine was experiencing operating losses of approximately $60 million per month, with projected losses of $150 million through the end of its fiscal year. The severe financial challenges forced the School of Medicine and its departments to cut costs by implementing a hiring freeze, decreasing compensation, and furloughing more than 1,300 employees. Plaintiff disputes Defendant's operating costs was the reason she was furloughed and ultimately terminated. Plaintiff was not the only employee from the ID-CRU who was furloughed at this time.

While Plaintiff was on furlough, Estwanick, in consultation with Dr. Presti, Dr. Spec, and White, made the decision to eliminate the Research Nurse Coordinator I position. At the time Plaintiff was placed on furlough, she was the only Research Nurse Coordinator I in the ID-CRU. Kessels testified at her deposition that she was not involved in the communication to eliminate Plaintiff's position nor was she asked her opinion about it. Defendant's Ex. 18, Kessels's Deposition [ECF No. 48-18 at 179:12–180:25].  Estwanick, an African American female, testified in her deposition that Plaintiff's race did not have "anything to do with the decision to eliminate her position." Defendant's Ex. I, Estwanick's Deposition at 121:1–12. Estwanick

10

testified that the decision to eliminate the Research Coordinator I position was based on Plaintiff's issues with her performance, but the larger issue was the financial constraints that had been put on Defendant due to the pandemic. *Id.* at 106:18–107:7. Estwanick also testified that it was her final decision, in consultation with HR, to eliminate Plaintiff's position. *Id.* at 120:13–16. She further confirmed had the leadership team recommended Plaintiff's position be eliminated, and had she disagreed with that conclusion, Plaintiff's position would not have been eliminated. *Id.* at 120:17–22. Plaintiff disputes that Estwanick made the final decision to eliminate her position.

On June 12, 2020, Plaintiff was informed that her position was being eliminated, and Defendant sent Plaintiff a written letter memorializing the position elimination with Estwanick's name typed at the bottom of the letter. No other African American employee in the ID-CRU was laid off in 2020. As of June 2020, approximately one-third of the ID-CRU staff was African American.

At sometime in 2020, Kessels testified the ID-CRU posted a position for a Research Nurse Coordinator II position instead of a Research Nurse Coordinator I because that position comes with more experience, such as a background in research and/or prior clinical trials. Defendant's Ex. 18, Kessels's Deposition [ECF No. 48-18 at 183:1–12].

On October 20, 2020, Plaintiff filed her charge of discrimination against Defendant. Plaintiff has been retired since her position with Defendant was eliminated.

### Summary Judgment Standard

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine [dispute] of material fact exists and that the

moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id*. "The basic inquiry is whether it is so one-sided that one party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citation omitted). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citation omitted).

To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines,* 536 F.3d 813, 818 (8th Cir. 2008). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. 242 at 252; *See also,*

12

*Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005).

## Discussion

In Counts I and II, Plaintiff alleges race discrimination and retaliation under Title VII. Defendant argues it is entitled to summary judgment on both claims because Plaintiff does not make a prima facie case. In Counts III and IV, Plaintiff alleges race discrimination and retaliation under the MHRA. Defendant argues that these claims were not timely filed, it is therefore entitled to summary judgment.

<u>Race Discrimination (Count I) under Title VII</u>

When analyzing a claim of race discrimination with indirect evidence under Title VII, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] Under the *McDonnell Douglas* framework, the initial burden rests with Plaintiff, who must establish a prima facie case of discrimination or retaliation by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *See also, Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 616 (8th Cir. 2007). To do so, Plaintiff must show that she: "'(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (quoting *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)). After Plaintiff has made a sufficient showing of a prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the

---

[3] Plaintiff does not argue that there is direct evidence to support her Title VII Counts. In the absence of direct evidence of race discrimination or retaliation, the burden-shifting framework of *McDonnell Douglas* applies. *Kasper v. Federated Mut. Ins. Co.,* 425 F.3d 496, 502 (8th Cir. 2005) (citing *Eliserio v. United Steelworkers of Am. Local 310,* 398 F.3d 1071, 1078 (8th Cir. 2005)).

adverse employment action. *Gordon v. Shafer Contracting Co.,* 469 F.3d 1191, 1196 (8th Cir.

2006). Once such a reason is articulated, the burden of production shifts back to Plaintiff to

demonstrate that the proffered nondiscriminatory reason is a pretext for discrimination. *Id.* At

this third step, Plaintiff is obligated to present evidence that (1) creates a question of material fact

as to whether a defendant's proffered reasons are pretextual and (2) creates a reasonable

inference that the discrimination was a determinative factor in the adverse employment decision.

*See, e.g., Stewart v. Indep. Sch. Dist. No. 196,* 481 F.3d 1034, 1043 (8th Cir. 2007); *Logan v.*

*Liberty Healthcare Corp.,* 416 F.3d 877, 880 (8th Cir. 2005).

　　　　Plaintiff is a member of a protected class to meet the first element of the *McDonnell*

*Douglas* framework, but Plaintiff's claim fails under the second element because she was not

meeting the legitimate expectations of the employer. While the "burden of establishing a prima

facie case...is not onerous," Plaintiff "must satisfy every element of [her] prima facie case,

carrying at all times the 'ultimate burden of proof and persuasion' to establish that the employer

discriminated against [her] on an impermissible basis." *Torgerson*, 643 F.3d at 1046-47.

　　　　Plaintiff argues in her response that she did meet the legitimate expectations of Defendant

because her performance issues were "overblown," she was excellent at her job and other

coworkers thought she was a great nurse. Plaintiff's self-serving allegations will not be

considered as sufficient evidence to establish a prima facie case. Plaintiff failed to offer any

evidence to suggest she met Defendant's legitimate expectations. To the contrary, it is

undisputed that Plaintiff received unfavorable performance evaluations in 2018 and 2019, and

she failed to cure her serious and repeated performance deficiencies that took place for over two

years. For instance, in 2018, Plaintiff's June 2018 performance evaluation rated her overall

14

performance 2 out of 4 and noted that Plaintiff had "some difficulty in interactions with co-workers." In December 2018, Cafazza made a complaint to Kessels that Plaintiff was not submitting her CRFs in a timely manner and that Plaintiff was making errors in her CRFs. Kessels documented two separate examples of errors in Plaintiff's CRFs supporting Cafazza's complaint and placed these in Plaintiff's file. When Plaintiff talked to Cafazza about her complaint, it resulted in Cafazza crying from the confrontation.

Plaintiff's June 2019 performance evaluation initially rated her overall performance 1.9 out of 4, which was later changed to a 2 out of 4, and noted "multiple instances where [Plaintiff] turned in incomplete CRFs," that Plaintiff "occasionally does not meet deadlines for CRF submission," and that Plaintiff "should work to resolve conflict in a positive and professional manner." Plaintiff declined Kessels offer to bring in a mediator to help resolve her ongoing interpersonal conflicts. Shortly after this performance evaluation in September 2019, another confrontation occurred with co-worker Spitz, who wrote a report about the incident described in the facts section above. After Estwanick, Dr. Presti, Dr. Spec and White received a copy of Spitz's written report, they decided to put Plaintiff on a PIP due to the persistent issues with Plaintiff's documented underperformance and negative interactions with co-workers. In January 2020, Plaintiff met with Kessels, Estwanick, and Dr. Spec where they presented her with the PIP that listed areas of concerns and expected improvement goals. After an unexpected medical leave of absence and the start of the pandemic in March 2020, Plaintiff returned to work and was told that she was expected to complete one chart abstraction per day. By March 27, 2020, Plaintiff reported that she had completed only five chart abstractions since she returned to work on March 13, which was less than the required one per day. Plaintiff assured her supervisors that she would

meet the one chart per day expectation, but ultimately did not do so. Three days after this meeting, she made a complaint to HR about the PIP. By April 10, 2020, Plaintiff was informed that she had not met the expectations of the PIP, both because she had not completed her assigned chart abstractions in the timeframe outlined in the plan, and because the charts she did complete were not acceptable quality and would have to be redone by other staff members. This is when Plaintiff was also informed that she was being placed on furlough due to the pandemic. Ultimately, when considering the negative financial impacts of the pandemic on Defendant in addition to her poor work performance, the decision was made to eliminate her position completely. Because Plaintiff failed to demonstrate she met Defendant's legitimate expectations, she fails to establish a prima facie case of race discrimination and retaliation.

Even if the Court found that Plaintiff established a prima facie case of race discrimination, Defendant has offered legitimate, nondiscriminatory reasons for Plaintiff's termination, namely, the financial burden of the pandemic, her underperformance and conflicts with co-workers as described above. "A legitimate reason for discharge may include the plaintiff's lack of improvement in the specific areas in which she was counseled." *Doucette v. Morrison Cnty.*, 763 F.3d 978, 983 (8th Cir. 2014) (citation omitted). The burden thus shifts back to Plaintiff to show that the proffered reason was mere pretext for discrimination.

To show pretext, Plaintiff "must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Lindeman v. Saint Luke's Hosp. of Kan. City*, 899 F.3d 603, 606 (8th Cir. 2018) (citation omitted). "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated

16

employees in a disparate manner, or (3) shifted its explanation of the employment decision."
*Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). But Plaintiff "must do more than
simply create a factual dispute as to the issue of pretext; [s]he must offer sufficient evidence for a
reasonable trier of fact to infer discrimination." *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874
(8th Cir. 1998) (citation omitted).

Plaintiff argues that Defendant used the pandemic and her work performance as an
excuse for her position elimination when it was really because of her race. Plaintiff maintains
that blaming the pandemic was pretextual because Defendant hired another nurse coordinator
following her position elimination and there was an influx of work at that time. She argues that
because Kessels often took the sides of Caucasian employees over African American employees
if there was an issue between them and Kessels forcing Plaintiff, Dr. Gray and Robinson in one
office supports Defendant's discriminatory intent. Plaintiff also disputes that Estwanick made the
final decision to eliminate her position, and it was really Kessels's decision. The evidence
directly contradicts these claims. In Plaintiff's deposition, she testified that herself and Gray
suggested that Robinson relocate to the office with them. A party should not be allowed to create
issues of credibility by contradicting [her] own earlier testimony." *Camfield Tires, Inc. v.*
*Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983). Nothing on the record supports that
Dr. Gray or Robinson were subjected to racial discrimination by Defendant. Further, Estwanick,
an African American female, testified it was her decision after consulting with HR, to eliminate
Plaintiff's position because of her work performance issues and the pandemic. *See Nash v.*
*Optomec, Inc.,* 849 F.3d 780, 783 (8th Cir. 2017) (finding that decisionmakers of the same
protected class "run[s] counter to any reasonable inference of discrimination"). Kessels also

testified at some point in 2020 that Defendant posted a Research Nurse Coordinator II position because they were seeking a candidate that has more experience, such as a background in research and/or prior clinical trials, which that position offers and the Research Nurse Coordinator I does not. Plaintiff provides no evidence that her previous position of a Research Nurse Coordinator I position was reposted or filled.

Plaintiff hasn't provided evidence for a reasonable jury to infer that discrimination based on her race was the real reason for her termination. *See Lindeman*, 899 F.3d at 606. "No specific facts suggest that [Defendant's] actions were more likely motivated by race than by its proffered justification." *Schaffhauser,* 794 F.3d at 905. Defendant gave Plaintiff ample opportunity to improve her performance issues that persisted for over two years as described at length above. Plaintiff offers no evidence, other than her own bald assertions, to contradict Defendant's evidence. *Shanklin v. Fitzgerald*, 397 F.3d 596, 603 (8th Cir. 2005). Simply stating that she did not agree with Defendant's evaluation of her performance or that her position elimination was because of the pandemic is insufficient to create a genuine issue of material fact, where such assertions are totally unsupported by the record. Employment discrimination laws prohibit "intentional discrimination based on certain, discrete classifications; [they] do[ ] not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." *Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998). "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th

18

Cir. 1995). For these reasons, the Court will grant summary judgment in Defendant's favor as to Count I.

Retaliation (Count II) under Title VII

To establish a prima facie case of retaliation, Plaintiff must show (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. *Tolen v. Ashcroft*, 377 F.3d 879, 883 (8th Cir. 2004). Defendant then may rebut Plaintiff's prima facie "case by advancing a legitimate, non-retaliatory reason for the adverse" action it took against her. *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir.2001). "If the defendant makes this showing, the plaintiff must demonstrate the defendant's proffered reason was a pretext for illegal retaliation." *Id.*

Assuming, without deciding, that Plaintiff meets the first two elements, Plaintiff's retaliation claim fails under the third element because she cannot establish a causal connection between the protected activity and the adverse employment action. Plaintiff claims she engaged in protected activity twice when she made two complaints to HR, one in May 2019 and one in March 2020.

Plaintiff's first complaint, made in May 2019, was that she was sharing an office with two African American females, Dr. Gray and Robinson. After Plaintiff made her office complaint, Defendant offered her the opportunity to move out of the office, but she declined. Then, over one year elapsed between the date Plaintiff made her May 2019 complaint and the date that Defendant eliminated Plaintiff's position. Importantly, Dr. Gray and Robinson also brought up issues about the office situation and are both still employed by Defendant. Plaintiff

19

fails to present any evidence that this complaint to HR played any role in her termination. With this lengthy delay, any causal nexus inference tends to evaporate. *Shanklin*, 397 F.3d at 604. Standing alone, a longer time gap between the protected activity and the adverse employment action "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." *Dhyne v. Meiners Thriftway, Inc*., 184 F.3d 983, 989 (8th Cir. 1999) (citation omitted).

Plaintiff's second complaint, made in March 2020, was that she believed the PIP was retaliatory. The undisputed facts show that Defendant dealt with issues relating to Plaintiff's performance for nearly two years in 2018 and 2019 before placing her on the PIP. After placement on the PIP, Defendant gave Plaintiff several chances to improve her performance and communicated its expectations. Plaintiff made this second complaint after two meetings in March 2020 where she was told there were concerns about her performance because she was not meeting Defendant's expectation under the PIP. Three days after the second meeting in March, Plaintiff made the complaint to HR about the PIP being retaliatory. By the next meeting about her performance in April 2020, Plaintiff still had not met her PIP chart expectations.

Despite Plaintiff's argument of temporal proximity between the March complaint and the adverse employment action, "more than a temporal connection is required to present a genuine factual issue on retaliation." *Arraleh v. County of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006). Although it is true that the time period of the second complaint to Plaintiff's position elimination is much closer than the first complaint, Plaintiff's poor performance overwhelms any temporal relationship between them. The Eighth Circuit "has often expressed an inclination to discount temporal proximity due to the perceived risk that employees who anticipate discipline or adverse

actions might preemptively engage in protected conduct to complicate or forestall such discipline or to set the stage for later retaliation claims." *Donathan v. Oakley Grain, Inc.,* 861 F.3d 735, 742 (8th Cir. 2017) (citing *Wilson v. Ark. Dept. of Human Servs.,* 850 F.3d 368, 376 (8th Cir. 2017). "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Wierman*, 638 F.3d at 1001. "This gives an explanation for the temporal proximity other than a retaliatory motive of the employer." *Smith v. Allen Health Sys., Inc*., 302 F.3d 827, 834 (8th Cir. 2002). The lack of causal connection is reinforced by the undisputed evidence of Plaintiff's failure to meet Defendant's expectations.

Even if Plaintiff established a prima facie case of retaliation, the evidence described above in the Court's analysis under Count I shows not only that Defendant offered a legitimate, nondiscriminatory reason for Plaintiff's termination, but also forecloses any finding that the Defendant's reasons given for discharging Plaintiff were pretextual. Filing a complaint "does not clothe [Plaintiff] with immunity for past and present inadequacies, [and] unsatisfactory performance." *Kneibert v. Thomson Newspapers, Mich., Inc*., 129 F.3d 444, 455 (8th Cir. 1997) (alteration in original) (quotation omitted). For these reasons, Defendant is entitled to summary judgment as to Count II.

<u>Race Discrimination (Count III) and Retaliation (Count IV) under the MHRA</u>

The MHRA makes it an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability." Mo. Rev. Stat. § 213.055.1(1)(a).

Federal courts "primarily apply Missouri law but may also apply federal employment discrimination law to the extent federal law is 'applicable and authoritative under the MHRA.'" *Heuton v. Ford Motor Co*., 930 F.3d 1015, 1019 (8th Cir. 2019) (citation omitted). Following the MHRA's 2017 amendment, effective August 28, 2017, "an employer violates the MHRA if the employee's protected status was the motivating factor in an adverse employment action." *Bram v. AT&T Mobility Servs*., LLC, 564 S.W.3d 787, 794 (Mo. Ct. App. 2018); Mo. Rev. Stat. § 213.010(2) (2017); Mo. Rev. Stat. § 213.101(4) (2017) (amended statute expressly abrogating previous case law relating to the "contributing factor" standard). "This new standard is analogous to the one used in employment discrimination claims under federal law, and imposes a higher burden upon the employee than the prior 'contributing factor' standard." *Bram,* 564 S.W.3d at 794-95.

However, in this case, it appears Plaintiff's claims were not timely filed. "Any action filed under the MHRA must be filed "no later than two years after the alleged cause occurred or its reasonable discovery by the alleged injured party." Mo. Rev. Stat. § 213.111.1. In Missouri, "Statutes of limitations are favored in the law, and cannot be avoided unless the party seeking to do so brings himself strictly within some exception.  Such exceptions are strictly construed and are not enlarged by the courts upon considerations of apparent hardship." *Hunter v. Hunter*, 237 S.W.2d 100, 104 (Mo. 1951) (internal quotation and citation omitted).

It is undisputed that Plaintiff received written notification from Defendant on June 12, 2020 that her position was being eliminated, effective August 1, 2020. It is also undisputed this action was filed on June 24, 2022. Defendant correctly argues that the statute of limitations begins to run on the date an employer communicates an adverse action to the employee, which

allowed Plaintiff until June 12, 2022 to file this action. Plaintiff concedes caselaw supports Defendant's argument and that she did not file this lawsuit within two years from the notification of her position elimination. However, Plaintiff argues that the two-year limitation should start to run on August 1, 2020 because that is the date her termination became effective and she thought her pro se complaint was timely filed.

The Eighth Circuit has addressed this issue and held that the MHRA limitations period begins to run when Plaintiff receives notice of a termination decision in *Dring v. McDonnell Douglas Corp.,* 58 F.3d 1323, 1328 (8th Cir. 1995). *See also, Delaware State College v. Ricks*, 449 U.S. 250, 101 (1980) (the statute began to run once the allegedly unlawful act was communicated to the plaintiff). If Plaintiff fails to file a timely charge, the lawsuit is barred unless she can demonstrate that the limitations period is subject to equitable modification such as waiver, estoppel, or tolling. *Anderson v. Unisys Corp.*, 47 F.3d 302, 306 (8th Cir. 1994); *Heideman v. PFL*, 904 F.2d 1262, 1265 (8th Cir. 1990), *cert. denied,* 498 U.S. 1026 (1991). Plaintiff has not made any arguments to excuse her untimeliness. Because Plaintiff filed her lawsuit after the two-year MHRA limitations period expired, the Court finds that Defendant is entitled to summary judgment on Counts III and IV. [4]

Even if these claims were not time-barred, because the MHRA's standard is analogous to the one used in employment discrimination claims under federal law, Defendant would be entitled to summary judgment on Counts III and IV for the same reasons as discussed above for Counts I and II. *See Bram,* 564 S.W.3d at 794-95.

---

[4] Because Defendant is entitled to summary judgment on the merits, the Court will not address the arguments made regarding Plaintiff's request for lost wages.

**Conclusion**

Based on the foregoing analysis, Defendant is entitled to summary judgment on each of Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [ECF No. 41] is **GRANTED**.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 18th day of October, 2023.

*John A. Ross*
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

24